HARLEM RIVER & P. R. CO. v. ARNOW et al.

(Supreme Court, Appellate Division, First Department. October 8, 1897.)

1. EMINENT DOMAIN—SELECTION OF DEPOT GROUNDS.
    Where lands are required for the location of depot buildings or the construction of a railroad, the company cannot be controlled in the selection, in good faith, but may itself make the choice of land to be taken.

2. SAME—CONTROL BY COURT.
    In proceedings to condemn land necessary for railroad purposes the courts will not interfere with a reasonable provision for prospective as well as existing business.

3. SAME—RIGHTS OF LANDOWNER.
    Where a railroad company's plan for railroad improvements, involving condemnation of lands, is better for it and for the public than one proposed by the owner of the land, the latter's wish not to sell must be subordinated to what seems to be for the general good.

Appeal from judgment on report of referee.

Petition by the Harlem River & Portchester Railroad Company for condemnation of land. From a judgment entered on the report of a referee appointed to hear and determine issues raised, Phœbe Jane Arnow and others appeal. Affirmed.

Argued before VAN BRUNT, P. J., and RUMSEY, WILLIAMS, INGRAHAM, and PARKER, JJ.

Milton A. Farler, for appellants.

Henry W. Taft, for respondent.

PARKER, J.    The referee before whom the issues in this proceeding were tried reached the conclusion that the public use .requires the condemnation of the real property in question, that the plaintiff is entitled to take and hold it for such public use upon making compensation therefor, and that commissioners of appraisal be appointed to ascertain the compensation to be made to the owners.    Pursuant to the referee's direction, the judgment appealed from was accordingly entered.    The property in controversy was a tract of about three acres, having an average length of about 600 feet, and in width was about 200 feet, situated next to plaintiff's railroad, and directly opposite one of its stations known as "Westchester."    It appears that the plaintiff is about to reconstruct its line of railroad from New Rochelle to the Harlem river by increasing the number of its trains from two to four, which change, it is claimed, is demanded by the increasing business of the plaintiff.    No question was made upon the trial by the defendants but that the additional trains were needed to accommodate the railroad's growing freight business.    Indeed, it was conceded by the defendant's counsel that such was the case.    But it was contended that additional facilities for passenger business at that station were not required.    Evidence was introduced, from which it appears that, notwithstanding the gradual increase in the population of Westchester, the passenger traffic had been decreasing since the construction of a trolley road which competes with the plaintiff in the carriage of passengers between Westchester and New York.    From the books of the company it appears that, while the passenger business in 1892, at this station, amounted to $20,440.67, for the year 1895 the receipts were only $9,964.23.    If it were not for the construction of the two additional freight tracks, which it is conceded the freight business requires, this evidence would tend strongly to show that there was no occasion for additional passenger facilities.    But the plan of the plaintiff is to use the two middle tracks for the transportation of freight, and the outside tracks for passengers; and, in order to secure individuals from accident, it is the purpose of the plaintiff to prevent the people from crossing the tracks at that point by the erection of high fences between the freight and passenger tracks.    The present street crossing at this point is by means of an overhead bridge about 15 feet above the level of the tracks, which the plaintiff intends to replace by an iron bridge crossing the four tracks and sidings at an elevation of 18 feet head room. The carrying out of this scheme seems to make it necessary, for the convenience not only of the plaintiff, but the public, that the plaintiff should construct a passenger station on the north side of the track, where the lands of the defendants are situated; the present station being on the south side.    It is for that purpose, together with the necessary freight sidings, that the plaintiff seeks to acquire the defendants' land.    We do not see, therefore, how the referee could

have reached any other conclusion than that the public use required the taking by the plaintiff of so much of defendants' land as should be necessary for the construction of a suitable passenger station, together with such further land as should be necessary and suitable for the proper and convenient use of the station for passenger purposes, and for necessary sidings. This, the defendants contended, would be accomplished by the taking of a strip of land 100 feet in width instead of 208.5 feet. In support of such contention they called an engineer, who proposed a substitute plan for the improvement at this point. The grade of the railroad is from 12 to 15 feet lower than the grade of the surrounding land, and this engineer proposed to contract the amount of land to be taken by substituting for the embankment, which the plaintiff proposes to maintain, a solid masonry wall on the proposed division line between the station ground and the remaining property of the defendants, and also to support the approaches to the station ground. He also proposed to shorten the freight sidings by having them terminate on the west of the bridge over the track, and, in case the sidings should prove insufficient to do the business, to provide for tracks on the south side of the railroad running up as far as the iron bridge. He agreed that it was "desirable" and "suitable" to have station grounds immediately back of the station building about 100 feet in width, which was in accordance with the plan proposed by the plaintiff. By his substitute plan, however, he cut down this width to 70 feet. While the plan thus proposed by the defendants' engineer would necessitate the taking of only about two-thirds of the land the plaintiff proposed to take, it would contract the available station grounds much below what the engineer conceded are usually deemed suitable and desirable, and at the same time compel the plaintiff to construct expensive walls of masonry. There seems to have been no controversy on the trial, but, if embankments were to be employed, instead of walls, that the embankments which the plaintiff proposed to construct are of proper dimensions. And the defendants' engineer testified: "Outside of cities it is usual for a company to maintain slopes and embankments, but I suppose it depends largely on the price of the land. What has to be done is usually determined, in general railroad practice, by the question of expense in doing it." The engineers of both parties seem to have agreed that in railroad construction it is the usual course. everything else being equal, to adopt the method which will result in the least expense; the substitution of vertical walls for embankments being the method adopted where it costs less than to acquire the necessary land upon which to build embankments; and the value of the land to be acquired determining whether the one construction or the other shall be adopted. But, eliminating the question of expense, slopes or embankments are usually preferred to walls. Upon the question of expense the plaintiff's engineer testified that the construction of the walls proposed by the defendants' substitute plan would cost about $17,000, from which should be deducted $3,000, which would be saved in excavation under the defendants' engineer's plan; making the total cost of construction by his plan about $14,-000 more than it would cost under plaintiff's plan. The evidence

tended to show that the land proposed to be taken was worth about $30,000, to which should be added $3,000 for alterations and changes in the ground, including the necessary excavations; making the total cost of improvements under the plaintiff's plan about $33,000. The defendants' plan proposed to take about two-thirds of the land, having a value of about $20,000, to which must be added the cost of erecting the walls, amounting to $14,000; making the total cost of the improvements under such plan about $34,000. It will thus be seen that the cost to the plaintiff will be about the same whether its own plan be adopted or that of the defendants, but in the latter case it will have less ground back of the station building than the defendants' engineer concedes to be usually "suitable" and "desirable." This also leaves out of account the plaintiff's plan for freight sidings, which the plan of defendants' engineer proposed to make up, in case of a necessity for its use, by taking off two strips of land, each approximately 50 feet wide and 200 feet long, on the south side of the track, which land appears to be as valuable as that on the north side. If the additional land is required for the plaintiff's purposes, there seems to be no reason why it should be compelled to acquire it of some other person instead of the defendants, and especially so where its convenience is not so well conserved. Indeed, it is the law in this state that, where the lands are required for the location of depot buildings, or the construction of a railroad, the company cannot be controlled in the selection, but may make the choice of land to be taken itself. In the Kip Case, 46 N. Y. 551, the court, in the course of its opinion, said:

"It is claimed that there are other lands in the same vicinity equally well adapted to the use of the applicant as those sought to be acquired by this proceeding, and which possibly might be acquired by purchase from the owners. But such objections to these proceedings are untenable. The location of the buildings of the company is within the discretion of the managers, and courts cannot supervise it. The legislature has committed to the discretion of the corporation the selection of lands for its uses; and, if the necessity of lands for such purposes is shown, and the lands sought are suitable, the court cannot control the exercise of the discretion, or direct which of several plats of ground shall be taken. If the taking of one plat of ground in preference to another could be shown to work great mischief and result in great loss, which could be prevented by taking another, and the proceeding to take one parcel compulsorily, in preference to another equally well adapted to the uses of the company, is from some unworthy or malicious motive, and not in the interests of the public. the court might entertain the question, and, in the exercise of a sound discretion, withhold its consent to the appropriation."

There is not present, in this case, any evidence tending to show unworthy or malicious motives; nor do we see that harm will necessarily result to the defendants by the taking of their land, for they are vacant lots wholly undeveloped.

It is also urged that the land is not required by the plaintiff for a freight siding; that no freight business is done at this point. But, as we have already observed, the taking of land for the construction of additional new tracks and the station building and station grounds is necessary, and it would seem not to be imprudent on the part of the railroad company, while incurring the large expense incident to such necessary improvements, to provide at the same time for prospective

business as well; and with a reasonable provision in such direction. the courts will not interfere. In re New York Cent. & H. R. R. Co.,. 77 N. Y. 248; In re Staten Island Rapid-Transit Co., 103 N. Y. 253,. 8 N. E. 548. We see no reason to doubt the good faith of the plaintiff's application; nor do we think it open to controversy that the plan of the plaintiff is better than that of the defendants, both for the plaintiff and the public. In such a situation, under the authorities in this state, the defendants' wish not to sell must be subordinated. to what seems to be for the general good.

The judgment should be affirmed, with costs. All concur.